**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Andrea Rihl, | : | Civil Action |
| | : | |
| Plaintiff | : | No. |
| | : | |
| v. | : | |
| | : | Jury Trial Demanded |
| The Walt Disney Company and Kristopher Lawrence, | : | |
| | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

### Introduction

1.     Plaintiff Andrea Rihl (Rihl) is suing her employer, The Walt Disney Company (Disney), and its Employee Relations professional, Kristopher Lawrence (Lawrence), for disability discrimination and retaliation for engaging in protected activity.

2.     Rihl brings her case under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C.A. § 12101 *et seq.* (ADAAA) and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* (PHRA).

3.     Rihl seeks back pay, reinstatement or front pay, loss of earnings capacity, compensatory damages, punitive damages (under the ADAAA), interest, negative tax consequence damages, injunctive relief, and attorney's fees and costs.

### Jurisdiction And Venue

4.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and the ADAAA. Furthermore, Defendants' conduct violated the PHRA and the pendant jurisdiction of this Court is invoked to remedy those violations.

5.      All jurisdictional prerequisites to bringing this action have been satisfied because:

(a)      On June 14, 2023, Rihl dual-filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC) (Charge No. 530-2023-06257), which alleged disability discrimination and retaliation in violation of the ADAAA and the PHRA.

(b)      On August 1, 2023, the EEOC issued a "Notice of Your Right to Sue" for Charge No. 530-2023-06257.

(c)      On October 23, 2023, Rihl dual-filed a timely Charge of Discrimination with the EEOC and the PHRC (Charge No. 530-2024-00560), which alleged disability discrimination and retaliation in violation of the ADAAA and the PHRA.

(d)      On October 27, 2023, the EEOC issued a Notice of Right to Sue for Charge No. 530-2024-00560.

6.      Venue is proper as Rihl worked remotely for Disney from her home Doylestown, Pennsylvania, which is located in the Eastern District of Pennsylvania.

**The Parties**

7.      Rihl is an adult individual who resides in Doylestown, Pennsylvania.

8.      Disney is an American multinational mass media and entertainment conglomerate that is headquartered at the Walt Disney Studios complex in Burbank, California.

9.      Upon information and belief, Disney employs over 220,000 employees.

10.      At all relevant times, Lawrence was an employee in Disney's Employee Relations department.

11.      At all material times hereto, Disney acted through its employees, agents, representatives and/or servants who were acting within the course and scope of their employment and authority.

**Factual Background**

**Rihl's Career with Disney**

12.     In October 1999, Rihl began her career with Disney as a Sr. National Sales Coordinator, DR Account Representative for ABC National Television Sales in Philadelphia, Pennsylvania.

13.     As Sr. National Sales Coordinator, DR Account Representative, Rihl managed the daily maintenance of regional business for ABC Owned Television Station Group and political sales with focus on the Philadelphia, Raleigh-Durham, Fresno, San Francisco, and Los Angeles markets; successfully developed and maintained direct response sales for the Philadelphia National Sales office; and facilitated relationships between Account Executives, advertising agencies, and station personnel with regard to all core business activity in conjunction with Regional Sports Television Networks and the Live Well Network.

14.     Rihl worked as Sr. National Sales Coordinator, DR Account Representative until December 2016 when she transitioned to Digital Media Sales Planning for Disney Advertising Sales in New York, New York.

15.     As Digital Media Sales Planning, Rihl counseled Sales teams in the development & preparation of creative and strategic omni-channel digital proposals for presentation to advertising agencies and clients in negotiations for regional and political business opportunities; delivered on full-cycle campaign management from proposal development through implementation as an expert in pre and post-sale campaign initiatives; analyzed inventory trends with account management and inventory teams to measure campaign effectiveness and impact on designated target audiences; collaborated with Senior Leadership to create new policy & pricing strategy for distribution across sales teams; communicated effectively with sales and management across the Disney Portfolio educating teams on guidelines; updated, policy & planning strategy for all digital

capabilities; and represented the local division of Disney Advertising Sales throughout the planning, building & execution stages of the most recent Company-wide order system migration process.

16.     During Rihl's time as a senior member of Digital Media Sales Planning, Rihl also assisted the VP, Sales in managing a team of 4 planners, assisted with interviewing candidates and on-boarding new employees, worked with leadership to create a new Planning Management role in our department (role existed across other brands but not in Local), and collaborated with leadership teams across brands (representing the Local division) on a company operating system migration.

17.     Rihl commuted to New York, New York from her home in Doylestown, Pennsylvania until around March 2020 when Disney transitioned the Digital Media Sales Planning to remote work.

18.     Following the transition to remote work, Rihl performed her job duties for Disney from her home in Doylestown, Pennsylvania.

**Rihl is Injured in a Sledding Accident and Diagnosed with a TBI;
Rihl Takes a Medical Leave of Absence**

19.     On February 7, 2021, Rihl was involved in a sledding accident in which she sustained a head injury.

20.     As a result of injuries sustained in the sledding accident, Rihl had to take a medical leave of absence beginning February 21, 2021.

21.     In June 2021, Rihl was diagnosed with a traumatic brain injury (TBI).

22.     Rihl is disabled within the meaning of the ADAAA because she has a physical or mental impairment that substantially limits one of more major life activities, including performing

manual tasks, seeing (vision), eating, sleeping, walking, standing, balance, lifting, bending, speaking, learning, reading, concentrating, thinking, communicating.

23.     On August 23, 2021, Rihl provided Lawrence with a letter from her neurologist that disclosed her medical diagnosis and treatment.

**Rihl Returns to Work with Approved Accommodations**

24.     On February 10, 2022, Rihl provided Lawrence with a letter from her medical provider that stated that Rihl was "medically cleared to resume work" on February 28, 2022 with two restrictions—Rihl needed to work remotely and Rihl needed to work 9:00 a.m. to 1:00 p.m. EST. Rihl's medical provider's letter notes that Rihl would be re-evaluated on July 8, 2022.

25.     Remote work was required because Rihl was unable to commute from her home in Doylestown, Pennsylvania to New York City due to her TBI symptoms.

26.     Notably, throughout the pandemic, aside from the period of Rihl's medical leave, Rihl successfully performed her job duties remotely, as did other team members.

27.     The modified work schedule enabled Rihl to attend medical therapy sessions in the afternoons.

28.     Although cleared to return to work on February 28, 2022, Disney was unprepared for Rihl's return and placed Rihl on unpaid two-week administrative leave.

29.     On numerous occasions, Rihl reached out to Lawrence who was unsure about Rihl's return, where Rihl would be going, and what Rihl would be doing. Lawrence never informed Rihl of where she would be returning to work.

30.     Rihl first learned that she was returning to a different position when Aliyah Cromwell (Cromwell), her new manager, reached out to set up a meeting.

31.     Rihl had no idea who Cromwell is and had to ask Lawrence. Lawrence was not responsive and just kept telling Rihl that the business was discussing and would let her know.

32.     Disney also failed to reinstate Rihl's healthcare coverage.

33.     Eventually, in September 2022, Disney retroactively reinstated Rihl's healthcare coverage to February 1, 2022; however, this mistake resulted in Rihl receiving bills for February and March 2022 healthcare coverage.

34.     To date, Rihl still receives Disney invoices after she sent notice with returned checks stating that these are now payroll deductions.

35.     On March 14, 2022, Rihl returned to work with the accommodations set forth in her medical provider's February 10, 2022 letter.

36.     Although Disney had updated Rihl's return to work to March 10, 2022, Rihl had no direction on her new role until she met with Cromwell on March 14, 2022.

37.     During this meeting, Cromwell told Rihl that she would be placed on a new hire program/training period with periodic meetings set up to train on new processes and policy.

38.     Most of these trainings were scheduled after 1:00 p.m. EST.

39.     Since Rihl's accommodation provided that she needed to work 9:00 a.m. to 1:00 p.m. EST, Rihl was unable to attend these trainings.

40.     Cromwell told Rihl that she did not have to attend the trainings and that she could just ask questions or set up another time to meet with the "specialist team."

41.     Although Rihl asked, she was never told who was on the "specialist team."

42.     When Rihl returned from medical leave, Disney placed her in a new role working on the Agency side of the business, including the brand additions like Hulu.

43.     Prior to Rihl's leave of absence, she worked on a completely different side of the business (Local).

44.     Moving to another side of the business would require additional support and instruction for any employee, not just an employee with a TBI.

6

45. After returning to work, Cromwell instructed Rihl to "assist the planners only" and "not interact with sales."

46. Rihl also discovered that certain changes had been made to certain processes. No one informed Rihl of these changes, which resulted in several challenges for Rihl, including:

(a) There were numerous restructuring episodes during the year of Rihl's medical leave, which were ongoing.

(b) There are new teams with new policy and processes.

(c) Rihl did not know who to reach out to for collaboration. No one ever introduced Rihl to her fellow team members.

(d) Rihl was unable to understand what was needed because she was assigned tasks without any background information or direction.

(e) Rihl could not efficiently complete tasks without appropriate knowledge of new process.

(f) Rihl was not permitted to ask questions or answer questions when approached for assistance. Rihl was instructed to loop Cromwell into correspondence so that she could address Rihl's questions.

(g) Rihl constantly had to reach out for direction due to the lack of communication.

(h) Communication was difficult since Rihl was matched with sales teams located on the West Coast even though Rihl's accommodation limited her hours to 9:00 a.m. to 1:00 p.m. EST.

(i) People reaching out to Rihl for assistance were unaware that her hours were limited to 9:00 a.m. to 1:00 p.m. EST, so they constantly reached out to Rihl at all hours

of the day and night, often asking for a response "ASAP." This was particularly an issue with West Coast colleagues.

(j)       Rihl never received a clear list of people that she was told to work with. Rihl was told that she would be working with two separate teams (Category & WPP), but never received a clear list of people she could expect to reach out.

(k)       When Rihl approached Cromwell about the aggressive nature of requests and her workload and consistent requests to complete before "logging off," Cromwell told Rihl that this was not "the norm" and that these requests usually did not require this much attention but should die down once the current task was completed.

(l)       Rihl's email address was not changed from ABC to Disney.

(m)      Rihl was never notified when changes to her role occurred. Rihl discovered changes when she would see an increase in requests for assistance. When Rihl approached management, Rihl was told, "it should be fine."

(n)       Rihl addressed these issues with Cromwell; however, they continued.

47.       On July 8, 2022, Rihl provided Lawrence with a letter from her medical provider, which reiterated Rihl's clearance to work with the accommodations set forth in her medical provider's February 10, 2022 letter. The letter also notes that the TBI Clinic would reevaluate Rihl's symptoms and work accommodations in six months.

48.       On October 24, 2022, Rihl spoke with Lawrence regarding her accommodations. During this conversation, Rihl explained, in part:

(a)       Rihl's medical provider requested that her accommodations remain in place until January 8, 2023 when the medical provider would review her health status.

(b)     Rihl explained all of her current challenges to Lawrence to help clarify the need for the accommodations being requested, including blurry vision, processing/focus, severe migraines, etc.

(c)     Cromwell and Rihl had discussed increasing her workload on a trial basis given her limitations caused by the TBI, specifically, cognitive/processing issues, severe migraines, sensitivity to light, and vision issues.

(d)     Cromwell and Rihl planned to revisit the workload increase on a weekly basis to see if changes needed to be made so that Rihl could continue to successfully perform her job duties.

49.     During this conversation, Lawrence indicated that Rihl's accommodations posed a "hardship," but failed to provide any example.

50.     Rihl told Lawrence that she would consider alternative accommodations if her accommodations posed a "hardship."

51.     On October 24, 2022, Rihl also followed up with Lawrence by email to recap this conversation.

52.     On December 9, 2022, Rihl received her FY22 Disney Advertising Management by Objectives summary (Disney Ad Sales FY22 MBO). Rihl received an Overall MBO Score of 75.0.

53.     Cromwell made some inaccurate statements in Rihl's Disney Ad Sales FY22 MBO, most notably:

(a)     "Andrea attended Planner DAS160 training / She can get overwhelmed with newer pricing and planning strategies / Some of the newer strategies proved challenging"

(b)     "This foundational knowledge will also be helpful as you work more independently to make decisions and provide solutions to campaign issues / how a planner can help to drive innovation"

54.     Also on December 9, 2022, Rihl received her Disney Ad Sales FY2022 Incentive Award Award Calculation Worksheet for Annual Performance, which shows a FY2022 final payout of $4,702.00. Disney also increased Rihl's base salary from $82,001.51 to $83,436.51, which represented a $1,435.00 merit increase.

55.     On December 16, 2022, Rihl provided Lawrence with a letter from her medical provider, which states that Rihl had "a follow up visit on 1/23/2023 with Dr. Schneider" to reevaluate her symptoms and work accommodations. The letter also reiterated Rihl's clearance to work with the accommodations set forth in her medical provider's February 10, 2022 letter.

56.     On December 15, 2022 and December 22, 2022, Rihl met with Cromwell to discuss the Disney Ad Sales FY22 MBO.

57.     During this meeting, Rihl told Cromwell that, in her opinion, Disney's Diversity, Equity, & Inclusion team has not made it clear that education about disabilities is also an important part of maintaining an inclusive culture and that there was a continued lack of training, group meetings/events, sessions and information available with regard to employees who live with a disability.

58.     On December 16, 2022, Rihl addressed her concerns with Cromwell's statements in her Disney Ad Sales FY22 MBO.

59.     On December 22, 2022, Cromwell responded to Rihl's email, only to connect her with Lawrence.

60.     Cromwell also directed Rihl to join groups (BErGS) that educated employees about disability in the workplace.

61.     On December 16, 2022, Disney Leaves team requested that Rihl provide an updated letter from her medical provider.

62.     On January 11, 2023, Samantha Spendlove (Spendlove), a Disney Asset Recovery Analyst, emailed Rihl and requested that she return a device, which was a second laptop/screen.

63.     Rihl responded to Spendlove and explained that she "had submitted a note requesting to keep the second laptop/screen for medical reasons. I am recovering from a traumatic brain injury and have difficulty with vision, processing. Having two separate screens as opposed to having to navigate between windows (when multiple tasks are required for my role) has been helpful."

**Disney Chooses to No Longer Accommodate Rihl, Refuses to Discuss Alternative Accommodations, and Forces Rihl on an Unpaid Leave of Absence**

64.     On January 16, 2023, Rihl provided Lawrence with a letter from Dr. Schneider, which states that Rihl has been under the TBI Neurology team's care "since 6/4/21 for management of consequences of a traumatic brain injury."

65.     Dr. Schneider's letter also informed Disney of continued work accommodations that Rihl needed in order to perform her essential job duties, which included remote work, limited work hours work hours (M-F 9a-1p EST) to accommodate her medical treatment, detailed and concise directions/instructions for her work assignment, direct notification of any policy or work process changes, 48hrs minimum allotment for completion of all assigned work tasks/projects, and limited and gradual workload changes based on understanding and reporting of ongoing medical progress.

66.     Dr. Schneider's letter also informed Disney that Rihl had "a follow up visit scheduled for 4/14/23 at which point we will re-evaluate her ongoing symptoms & continued progress, as well as provide any updates to these work accommodations."

67.     On January 23, 2023, Rihl spoke with Lawrence regarding Dr. Schneider's January 16, 2023 letter.

68.     During this conversation, Lawrence asked Rihl when her accommodations were ending.

69.     Lawrence also told Rihl that Disney needed to justify her full time pay and that part time was managing 1-2 accounts.

70.     Rihl explained to Lawrence that she was responsible for 6+ accounts.

71.     Rihl also explained, in part, that the "additional accommodations" in Dr. Schneider's January 16, 2023 letter were new additions to the letter, but not to the business. Upon returning from Rihl's leave of absence, Rihl discussed the "additional accommodations" with Cromwell. Although Rihl reiterated these "additional accommodations" to Cromwell, she generally dismissed them.

72.     Rihl further explained that the "additional accommodations" did not reflect her "understanding of the job" as she had been a member of Disney's sales divisions for 23 years.

73.     The "additional accommodations" are not unreasonable and would benefit all employees, not just Rihl.

74.     Rihl needed short breaks during her workday to step away from her computer; however, Lawrence told Rihl there was a concern that she was taking breaks as a salaried employee.

75.     Prior to Rihl's injury, she commuted to the office. On most days, Rihl was not asked to perform a full time workload.

76.     During this conversation, Lawrence told Rihl that Disney "could not approve these accommodations forever" and that "it had already been a year."

77.     On January 23, 2023, Rihl also followed up with Lawrence by email to recap this conversation.

78.     Every time Rihl spoke with Lawrence, her workload increased.

79.     On January 30, 2023, Lawrence informed Rihl that Disney would no longer honor her accommodations.

80.     Lawrence claimed—without any explanation—that Rihl's accommodations were a "hardship" and that Disney was legally allowed to place Rihl back on medical leave.

81.     Rihl attempted to explore alternative accommodations, including transferring to another position or cutting to a part-time position; however, Lawrence told Rihl that Disney would not offer her any other accommodations and that she would be put on a medical leave of absence.

82.     On February 3, 2023, Disney placed Rihl on an involuntary medical leave of absence from February 6, 2023 to March 14, 2023.

83.     To date, Rihl remains on an unpaid involuntary medical leave of absence.

**Rihl Files a Charge of Discrimination**

84.     As alleged above, on June 14, 2023, Rihl dual-filed a timely Charge of Discrimination with the EEOC and the PHRC (Charge No. 530-2023-06257), which alleges disability discrimination and retaliation in violation of the ADAAA and the PHRA.

85.     Rihl's Charge of Discrimination alleges, in part, that:

(a)     Disney revoked Rihl's reasonable accommodations and refused to discuss alternative accommodations.

(b)     Disney placed Rihl on an involuntary medical leave of absence from February 6, 2023 to March 14, 2023.

(c)     To date, Rihl remains on an unpaid involuntary medical leave of absence.

(d)     Rihl wants to return to work and is able to perform the essential functions of her position with reasonable accommodations.

(e)     Rihl has been applying for other positions at Disney.

**Rihl Applies for Open Positions at Disney; Disney Rejects Rihl for These Positions**

86.     Since August 10, 2023, Rihl has applied for over 20 positions at Disney, all of which Rihl is qualified for based on Rihl's work experience with Disney.

87.     On August 24, 2023, Rihl had a phone interview with Erica Johnston (Johnston) for a Manager, Pricing & Planning position.

88.     During this interview, Rihl told Johnston that she is currently on a company mandated medical leave because her accommodations were not able to be met.

89.     Johnston asked Rihl about her accommodations.

90.     Rihl told Johnston that she was looking for a remote position but would be able to commute to the office when needed.

91.     Johnston told Rihl that the position she was interviewing for was on site, but that Disney had a few Planning Specialist positions available, one that just posted yesterday, and that were remote eligible.

92.     Johnston told Rihl that she wanted to send Rihl the link for the Planning Specialist positions and that once Rihl applied for the position, Johnston would discuss Rihl's resume with the hiring manager and be in touch if they were interested in interviewing Rihl for the role.

93.     Johnston told Rihl that even though the job post states the Planning Specialist position is on site, the Planning Specialist position is a remote eligible position.

94.     Johnston reiterated that once Rihl applied for the Planning Specialist position, she would pull Rihl's resume for the hiring manager.

95.     On August 24, 2023, Johnston sent Rihl the link to apply for one of the open Planning Specialist positions.

96.     On August 28 2023, Rihl applied for the open Planning Specialist positions. Rihl was more than qualified for this position based on Rihl's work experience with Disney.

97.    On or about August 31, 2023, Disney removed the postings for the Planning Specialist positions.

98.    On September 20, 2023, Rihl applied for a Sr. Manager, Social Media Customer Support position. Rihl was more than qualified for this position based on Rihl's work experience with Disney.

99.    On October 17, 2023, Rihl spoke with Kelly McGuire (McGuire), Disney's recruiter, about the Sr. Manager, Social Media Customer Support position.

100.    McGuire started the conversation with Rihl by stating that there has been an "interesting update just within the past few days" and then stated the Sr. Manager, Social Media Customer Support position had initially been posted as remote, but the recruiting team has been instructed by HR to pull the posting and repost it as "an in office only" role.

101.    McGuire stated that it was explained that this was due to team dynamics but recruitment is not necessarily privy to why these decisions are made.

102.    McGuire stated that candidates for the Sr. Manager, Social Media Customer Support position will now be required to reside in either San Monica or San Antonio — if someone is open to relocation, they would consider that.

### Disney's Legal Violations

103.    Rihl is disabled under the ADAAA and PHRA due to the TBI.

104.    Rihl is disabled under the ADAAA and PHRA because Disney regarded her as disabled or because Rihl has a record of a disability.

105.    At all relevant times, Rihl was qualified for her position and was able to perform the essential functions of her position with an accommodation.

106.    Rihl informed Disney of her condition and requested reasonable accommodations.

107.    There were available accommodations that would have been effective and would not have posed an undue hardship to Disney.

108.    Disney failed to reasonably accommodate Rihl's requests regarding her disability.

109.    Disney revoked Rihl's reasonable accommodations and refused to discuss alternative accommodations.

110.    Disney forced Rihl on an unpaid leave of absence due to disability discrimination (actual disability, record of disability, regarded as disabled), and/or retaliation for requesting reasonable accommodations.

111.    Rihl is qualified for or overqualified for all of the positions that Rihl has applied for at Disney since August 10, 2023 based on Rihl's work experience with Disney.

112.     Disney has rejected Rihl for all of the positions that Rihl has applied for since August 10, 2023 due to disability discrimination (actual disability, record of disability, regarded as disabled), and/or retaliation for requesting reasonable accommodations and/or for filing a Charge of Discrimination.

113.    Disney's actions have caused Rihl significant financial loss, as well as emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation, embarrassment, and loss of dignity.

114.    Rihl wants to return to work and is able to perform the essential functions of her position with reasonable accommodations.

**Count I**
**Disability Discrimination (ADAAA and PHRA)**

115.    Paragraphs 1-114 are incorporated by reference as if fully set forth herein.

116.    The acts, failures to act, practices and policies of Defendants set forth above constitute disability discrimination (actual disability, regarded as disabled, record of disability, failure to provide reasonable accommodations) and violate the ADAAA and PHRA.

117.    Lawrence is sued individually under the PHRA (and not under the ADAAA) because Lawrence aided and abetted Disney's discriminatory conduct against Rihl.

WHEREFORE, Rihl respectfully requests this Court:

A.    Issue a Declaratory Judgment declaring that Defendants' actions as set forth in this Complaint are unlawful and violate the ADAAA and PHRA.

B.    Issue equitable/injunctive relief including:

(1)    Issue preliminary and permanent injunctions enjoining and restraining Defendants, their officers, agents, employees, and those acting in participation with Defendants, from engaging in any act or practice of harassment, discrimination, and/or retaliation against employees in violation of the ADAAA and PHRA.

(2)    Order Disney to provide training to all employees on harassment, discrimination, and retaliation prevention and related compliance under the ADAAA and PHRA—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows.

(3)    Order Disney to deliver to its employees a copy of the jury verdict and trial court judgment.

(4)     Order Disney to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under the ADAAA and PHRA—with the reporting specifics to be tailored based on the evidence.

(5)     Order Disney to reinstate Rihl upon such terms and conditions as will put Rihl in the position she would have occupied had Defendants not unlawfully discriminated against her.

C.      Enter judgment in favor of Rihl and against Defendants for back pay, including wages and fringe benefits.

D.      Enter judgment in favor of Rihl for front pay in lieu of reinstatement.

E.      Enter judgment in favor of Rihl and against Defendants for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation, embarrassment, and loss of dignity.

F.      Enter judgment in favor of Rihl and against Disney for punitive damages, as allowable by law.

G.      Award Rihl reasonable attorney's fees together with the costs of this action.

H.      Award Rihl pre-judgment and post-judgment interest.

I.      Enter judgment in favor of Rihl for any other monetary losses as a direct result of Defendants' violation of the ADAAA and PHRA, including but not limited to negative tax consequence damages.

J.      Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Rihl's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

## COUNT II
## Disability Retaliation (ADAAA and PHRA)

118.    Paragraphs 1-117 are incorporated by reference as if fully set forth herein.

119.    The acts, failures to act, practices and policies of Defendants set forth above constitute disability retaliation (including retaliatory firing) in violation of the ADAAA and PHRA.

120.    Lawrence is sued individually under the PHRA (and not under the ADAAA) because Lawrence aided and abetted Disney's retaliatory conduct against Rihl.

WHEREFORE, Rihl respectfully requests this Court:

A.    Issue a Declaratory Judgment declaring that Defendants' actions as set forth in this Complaint are unlawful and violate the ADAAA and PHRA.

B.    Issue equitable/injunctive relief including:

(1)    Issue preliminary and permanent injunctions enjoining and restraining Defendants, their officers, agents, employees, and those acting in participation with Defendants, from engaging in any act or practice of harassment, discrimination, and/or retaliation against employees in violation of the ADAAA and PHRA.

(2)    Order Disney to provide training to all employees on harassment, discrimination, and retaliation prevention and related compliance under the ADAAA and PHRA—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows.

(3)    Order Disney to deliver to its employees a copy of the jury verdict and trial court judgment.

(4)    Order Disney to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under the ADAAA and PHRA—with the reporting specifics to be tailored based on the evidence.

(5)     Order Disney to reinstate Rihl upon such terms and conditions as will put Rihl in the position she would have occupied had Defendants not unlawfully retaliated against her.

C.     Enter judgment in favor of Rihl and against Defendants for back pay, including wages and fringe benefits.

D.     Enter judgment in favor of Rihl for front pay in lieu of reinstatement.

E.     Enter judgment in favor of Rihl and against Defendants for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation, embarrassment, and loss of dignity.

F.     Enter judgment in favor of Rihl and against Disney for punitive damages, as allowable by law.

G.     Award Rihl reasonable attorney's fees together with the costs of this action.

H.     Award Rihl pre-judgment and post-judgment interest.

I.     Enter judgment in favor of Rihl for any other monetary losses as a direct result of Defendants' violation of the ADAAA and PHRA, including but not limited to negative tax consequence damages.

J.     Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Rihl's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

## **Jury Demand**

Rihl demands a jury to try all claims triable by jury.

Respectfully submitted,

Dated: October 30, 2023

Stephanie J. Mensing
PA ID No. 89625
Mensing Law LLC
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 586-3751; (215) 359-2741 fax
stephanie@mensinglaw.com
Attorney for Plaintiff